(156 App. Div. 864.)

## In re DAY.

(Supreme Court, Appellate Division, First Department.   May 29, 1913.)

ATTORNEY AND CLIENT (§ 126*)—OFFICE OF ATTORNEY—REGULATION OF PRO-
    FESSIONAL CONDUCT.

> Where an aged woman transferred her property, which was subject
> to various clouds on title, to an attorney to clear the title, dispose of
> the property, and pay her the balance, deducting certain fees, the at-
> torney, even though her business representative, is amenable to the sum-
> mary processes of the court and may be required to deliver the money
> in his hands to the city chamberlain to await the determination of the
> rights of the parties.
>
> [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 264–
> 273;  Dec. Dig. § 126.*]

Appeal from Special Term, New York County.

In the matter of the application of Olive S. Day to compel William
W. Lapoint, an attorney, to pay over certain moneys.  From an order
directing respondent to pay over such moneys, he appeals.  Affirmed.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT,
DOWLING, and HOTCHKISS, JJ.

John J. Lordan, of New York City, for appellant.
Henry W. Bridges, of New York City, for respondent.

HOTCHKISS, J.   It appears from the record before us that the
petitioner, a woman upwards of 80 years of age, was the owner of
some unimproved property in New Jersey, which was subject to vari-
ous liens, and the title to which was apparently somewhat, but not
seriously, clouded.   Except for the above, petitioner had no other
property of practical value, no income, and no means of support, save
such as was afforded by the credit she might obtain on the faith of the
property aforesaid.   There were numerous claims against her, some
or all of which she disputed, including claims for services of attorneys
who had formerly represented her but with whom she seems to have
quarreled.   In this situation, in June, 1912, she retained the appellant
to advise and assist her in the management of her property and affairs,
clearing the title to such property, to the end that it might be marketed
to advantage, adjusting and paying off the liens and incumbrances, and
protecting her from unjust demands growing out of previous trans-
actions.   On June 28, 1912, petitioner executed and delivered to appel-
lant an instrument under seal which recited that she had conveyed said
property to appellant; he covenanting "to manage, operate, develop and
erect certain buildings" thereon, "to remove any and all clouds upon
the title," and not to mortgage, except to procure funds to erect build-
ings, or to exploit or develop the property.   The same instrument
contained a declaration on appellant's part that he held the property
in trust for petitioner and would reconvey to her upon three months'
notice, or in any event at the expiration of five years from date.
Monthly "reports" and "accounts" were to be rendered by appellant of
all he did with reference to the property and of all moneys received
and paid out.   A further clause of the instrument provided that in con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sideration of appellant's services in developing and exploiting the property, "and for and in consideration of *any and all legal services* rendered by" appellant to petitioner, in connection with the property, the petitioner should pay to appellant "two and one-half per centum of any and all sums received" by him "from the sale, rent or other income from said property." By further covenants in the same instrument, and to secure appellant's faithful performance of its terms, he bound himself in the penalty of $10,000 "as required (sic) damages and not as a penalty," and agreed to deposit with petitioner certain shares of stock, which the petition alleges are without substantial value. The deed above referred to was recorded September 30, 1912.

On June 28, 1912, appellant gave the petitioner a paper pertaining to certain details of her matters and containing the following:

"I also agree to supply the money for board and expense money to Mrs. Day until such time as Mrs. Day has income from any of her property."

In the following December, conceiving herself to have an interest in what the petition calls the "Jumel Estate," she employed appellant to recover the same, and received from appellant a paper containing, among other things, the following with reference to the New Jersey property:

"I hereby agree to make no charge for services which I have rendered or which I may hereafter render to Olive S. Day, as attorney in the following matters—Clearing title to New Jersey lots either at West New York, Hoboken, or elsewhere."

Concededly, this included the property covered by petitioner's deed to appellant.

The petition alleges that, being unable to secure from appellant any report of his labors in her behalf or of his receipts and disbursements from her property, in January, 1913, she sought advice, formally revoked appellant's authority to act for or represent her, and demanded an account of his transactions. In February appellant furnished her with a so-called "account," which is attached to the petition, and which shows, as elsewhere explained in the record, that appellant had twice mortgaged the property, first for $7,000 and again for $10,000, satisfying the former mortgage from the proceeds of the latter. The balance shown by this account to remain in appellant's hands is $5,235.41, which is the sum he has, by the order appealed from, been directed to pay to the chamberlain to await the result of the reference provided for in the order. In opposition to the motion, appellant presented affidavits of himself and others and various exhibits. As the merits of the petition are to be the subject of the reference, we refrain from commenting thereon, as the same are made to appear upon this record, further than to say that we are entirely satisfied that petitioner made out a prima facie case of indebtedness and of professional impropriety as well, and that the order was justified.

Appellant urges us to reverse the order on the ground that whatever moneys he received came into his hands, not as the attorney, but as the business representative of the petitioner, and therefore that he is not amenable to the summary process of the court, with respect thereto, and he cites the Langslow Case, 167 N. Y. 314, 60 N. E. 590, as

authority.   It is true that there are expressions to be found in the opinion in that case, which, standing alone, might justify its extension to a case so plain as the present; but, as has so often been said, the language of an opinion must be interpreted in the light of the facts to which it was directed.   There it appeared (pages 316 and 317 of 167 N. Y., page 591 of 60 N. E.) that the moneys received by the attorney came into his hands after his professional relations with his former client had ended, and he had assumed the management of her property "as her business agent."   The rule applicable to such cases as the present was clearly stated by Lord Tenterdon, then Chief Justice Abbott, in the Matter of the Executors of Aitkin, deceased (4 Barn. & Ald. 47):

"The question in this case is whether this court will compel an attorney to do that which in justice he ought to do.   Now the rule by which the courts are to be governed in exercising this summary jurisdiction over its officers seems to be this: Where an attorney is employed in a matter wholly unconnected with his professional character, the court will not interfere in a summary way to compel him to execute faithfully the trust reposed in him. But where the employment is so connected with his professional character as to afford a presumption that his character formed the ground of his employment by the client, there the court will exercise this jurisdiction. And the case where the court compelled the attorney to deliver over deeds, placed in his hands for the purpose of making a conveyance, proceeds upon this ground.   For inasmuch as a conveyance requires knowledge of law, the trust is reposed by the client in the party, in respect of his being an attorney."

It would be most unfortunate, were this salutary rule, as thus expressed by the learned Chief Justice, to be in any wise relaxed.   What we have said suffices for the decision of this case, and ordinarily, nothing further would be called for.   But the growing frequency with which the Langslow Case is cited in matters analogous to the present, certain of its phrases being misinterpreted and sought to be used as a cloak and a shield against professional wrongdoing, moves us to make some further observations, which are undisputably timely, and may not be without value.   The cry of, "O Tempora! O Mores!" is an old one; but, for reasons readily appreciated by the most casual observer of current history, the present time is peculiarly one when it behooves us, as lawyers as well as judges, not only to maintain the highest professional standards in dealings between attorneys and their clients, but to keep constantly in mind and adhere strictly to the traditional code of ethics which instructs, and should govern generally, those who exercise the professional office.   It is to be feared that many members of the bar have failed in this.   If this be true, it should not be surprising to find that the public is affected by the example of the bar, and that its respect for the courts, the judges, the time-honored machinery employed in the administration of justice, and even for the law itself, is seriously impaired.   A single illustration will suffice.   It is a truism of civil polity that courts should never, in any manner, be coerced in their judgments, and that they should be moved only by arguments duly presented according to fixed rules of procedure, established to protect them from irregular methods of approach; that their deliberations should be secret and recognized as inviolate; that proceedings before grand juries should likewise be respected as

sacred and the testimony of witnesses before them held sacredly con-
fidential. In many jurisdictions, if not in ours, the observance of these
rules has from time immemorial been deemed of such moment in the
enforcement of justice and the public interest that their violation is
summarily punishable as for contempt of court.

Yet, to-day, in this community and elsewhere, what judgments are
to be rendered by courts in pending cases (the decisions in which have
in all probability not yet been agreed upon by the judges themselves);
what witnesses appeared to-day, before the grand jury in some matter
of popular interest, and the testimony they gave; what witnesses will
be produced before the same body to-morrow, and the testimony they
are to give—all this, and much more of similar import, is commonly
deemed "news," and, as such, as much the proper subject for news-
paper report as the debates in Congress or the latest fashionable wed-
ding.

The calloused indifference with which this state of affairs, so deeply
significant, and affecting so vital a phase of our political well-being, is
regarded, not alone by the public, but apparently by many members
of the bar itself, shows how far we are out of touch with former
standards. Were the bar, as a body, alive to the importance of study-
ing as deeply and knowing as thoroughly the ethics of their profes-
sion, as they study and know the law itself, such a state of affairs
would not exist, because their knowledge of and attitude towards such
matters would prove an educational force extending to the public at
large, the virtue and good sense of which would soon recognize and
correct many present-day evils, of which the foregoing is but an ex-
ample.

The order is affirmed, with $10 costs and disbursements.

INGRAHAM, P. J., and SCOTT, J., concur. CLARKE and
DOWLING, JJ., concur in result.